FILED

2026 Jul-22  AM 08:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

**ZP 360 HUNTSVILLE MOUNTAIN, LLC, *et al.*,**
    Plaintiffs,

**v.**

**AEC SITE SOLUTIONS, LLC,**
    Defendant.

**Case No. 5:23-cv-1178-CLM**

## MEMORANDUM OPINION

In early 2022, ZP 360 Huntsville Mountain, LLC ("ZP 360") and ZP 361 Huntsville Research Park QOZB, LLC ("ZP 361") (collectively, "Zimmer") set out to build two multi-family housing developments in Huntsville. Zimmer hired a general contractor. The general contractor then hired a subcontractor, AEC Site Solutions, LLC ("AEC"), and work began. But within just a few months, things started to go wrong. The general contractor failed to meet expectations, so Zimmer terminated its contracts. And less than a year later, after Zimmer filled the general contractor's shoes, Zimmer also terminated AEC's subcontracts. Zimmer eventually managed to complete the projects. Still, the damage was done. Constant delays and reworks cost Zimmer time and money.

So Zimmer sued AEC to recoup losses that, it says, are attributable to AEC and its deficient performance. Zimmer brings two claims for negligence and two for breach of contract. The parties now move for summary judgment. AEC asks for summary judgment on each of Zimmer's claims. (Docs. 78, 79). Zimmer asks for partial summary judgment on its breach of contract claims. (Doc. 88). And Zimmer also seeks to strike AEC's amended answer and affirmative defenses that it filed after discovery ended. (Doc. 75). For the reasons stated below, the court (1) **GRANTS IN PART** and **DENIES IN PART** AEC's motions for summary judgment, (2) **DENIES** Zimmer's partial motion for summary judgment, and (3) **DENIES** Zimmer's motion to strike **AS MOOT**.

## BACKGROUND

This case stems from AEC's work as a subcontractor for two housing development projects owned by Zimmer entities. ZP 360 is the owner and developer of one of those projects, the Terraces at High Mountain (the "Terraces"). ZP 361 is the owner and developer of the other project, the Boardwalk at Research Park (the "Boardwalk"). The key facts for the two projects, and Zimmer's claims, largely overlap.

### A.    The Parties and Projects

On February 28, 2022, ZP 360 hired Huffman Contractors ("Huffman") to serve as general contractor on its Terraces project.[1] (*See* doc. 86-4). A little over a week later, on March 8, ZP 361 hired Huffman to serve as general contractor on its Boardwalk project. (*See* doc. 80-2). Huffman then signed subcontracts with AEC for both projects. (*See* docs. 84-3; 88-9).

#### 1.    The Terraces

The Terraces project called for the construction of six apartment buildings and a clubhouse. Each building was assigned an identification number, with A1-A6 denoting the apartment buildings and A7 the clubhouse. Because the Terraces site is located on hillside terrain, the buildings had to include a "lower-level pad" and an "upper-level pad."[2] (*See* doc. 85-2, p. 6). After the lower-level pads were completed, "stem walls or retaining walls were required to be constructed" before the upper-level pads could be built. (Docs. 81-1, p. 12; 84-2, p. 14). AEC's job was to perform site work, "including but not limited to, demolition, erosion control, grading, paving, utilities and other related services." (Doc. 6, pp. 4-5). Some of AEC's tasks under these categories included: preparing the

---

[1] Different Huffman entities served as the general contractors on the projects, but AEC's corporate representative confirmed during his deposition that AEC "just knew" them both as "Huffman." (*See* doc. 88-1, p. 46-47). So this opinion treats Huffman as one entity.

[2] "Pads" are cleared and leveled areas of land that "allow for follow-on construction of each pad's underslab utilities." (*See* doc. 85-2, p. 8). Once the underslab utilities are constructed, a concrete slab goes on top so "vertical construction" can start. (*See id.*).

building pads, installing sanitary and storm sewers, and completing an on-site water tie-in. A general layout of the Terraces site is shown below:



(Doc. 85-2, p. 7).

### 2.    The Boardwalk

The Boardwalk project was divided into two phases. Phase 1 called for the construction of four multi-story apartment buildings, A1-A4, and Phase 2 called for the construction of two additional buildings, A5-A6. Unlike the Terraces, the Boardwalk site was flat. But AEC's scope of work for the Boardwalk was largely the same as its scope of work for the Terraces. So AEC was again tasked with, among other things: preparing the building pads, installing sanitary and storm sewers, and completing an on-site water tie-in. A general layout of the Boardwalk site is shown below:

3



(*Id.*, p. 8).

### 3. Project Schedules

As general contractor, Huffman developed schedules for both projects. These schedules purportedly included deadlines for AEC to complete certain tasks within its scope of work. The parties dispute whether AEC received some of these schedules or agreed to be bound by them. But the record evidence shows that, at the very least, AEC received a milestone chart for the Terraces project on July 20, 2022. The relevant portion of that chart is below:

**HUFFMAN & CO.**  **HC2111 Terraces at High Mountain Chart**

Last Printed On: 07/19/2022

| Item of Work | Contractor | Forecast | Actual | Status |
|---|---|---|---|---|
| **Site Work** | | | | |
| ◆ Mobilize | AEC | 04/18/2022 | 04/18/2022 | Made |
| ◆ Building Pad 1 | AEC | 07/18/2022 | | |
| ◆ Building Pad 2 | AEC | 07/25/2022 | | |
| ◆ Building Pad 3 | AEC | 08/01/2022 | | |
| ◆ Building Pad 4 | AEC | 08/08/2022 | | |
| ◆ Building Pad 5 | AEC | 08/15/2022 | | |
| ◆ Building Pad 6 | AEC | 08/21/2022 | | |
| ◆ Building Pad 7 | AEC | 08/26/2022 | | |
| ◆ SS | AEC | 08/17/2022 | | |
| ◆ Storm | AEC | 08/22/2022 | | |
| ◆ Water | AEC | 10/11/2022 | | |

(*See* doc. 88-10, p. 3). As shown, Huffman "forecast" that AEC would complete general construction tasks for the Terraces no later than October 2022. Aside from this chart, Zimmer contends that Huffman provided AEC two other schedules that "fixed" AEC's construction milestones. (*See* doc. 90, pp. 14, 17). One of those schedules applied to the Terraces project and mostly tracks the deadlines shown in the chart above. (*See* doc. 88-

11). The other schedule applied to the Boardwalk project. According to Zimmer, it included the following deadlines for AEC:

> a. Building A1: September 12, 2022
>
> b. Building A2: September 19, 2022
>
> c. Building A3: September 26, 2022
>
> d. Building A4: October 3, 2022
>
> e. Building A5: October 10, 2022
>
> f. Sanitary Sewer: October 14, 2022
>
> g. Building A6: October 17, 2022
>
> h. Building A7: October 24, 2022
>
> i. Building A8: October 31, 2022
>
> j. Water System: November 9, 2022
>
> k. Storm Drainage: April 18, 2023
>
> l. Curbs/Roadways: February 17, 2023

(*See* doc. 90, p. 17; *see also* doc. 88-3). AEC's owner and 30(b)(6) witness, Bennett Steele, stated that he had "never [seen] . . . or agreed to" the above schedule. (*See* doc. 88-2, pp. 326-27). But email correspondence between Huffman personnel reflects that the schedule received "some input" from an AEC employee named Don Byrd—someone Steele said that AEC employed to assist with "project management" and "pricing." (*See id.*, p. 43).

Despite AEC's apparent communication with Huffman regarding the schedules, Steele maintains that "AEC never agreed to a schedule and no schedule was ever made a part of" the subcontracts. (*See* docs. 86-1, p. 2; 86-2, p. 2). Both subcontracts show that an "Exhibit C" would provide a "progress schedule." (*See* docs. 84-2, p. 150; 88-9, p. 28). But as best the court can tell, no filed version of the subcontracts includes an Exhibit C. And according to AEC, "no schedule was incorporated into Exhibit C."

(Docs. 91, p. 4; 93, p. 5).

## B.    The Relevant Contracts

Two sets of contracts are important here: (1) Zimmer's general contracts with Huffman and (2) the subcontracts between Huffman and AEC.

The general contracts required Huffman to "prepare and submit … critical path schedules showing the relative times for performance of all significant tasks" assigned to Huffman and its subcontractors. (Doc. 80-2, p. 73). At minimum, those schedules were to include "permit dates; procurement dates … and the start/finish dates for construction of all critical path activities." (*See id.*). In § 16.10, Huffman warranted, as the general contractor for both projects, that it was "qualified and licensed to perform construction services" in Alabama. (*See id.*, p. 27). Despite these warranty provisions, the general contracts allowed Zimmer, which is not a licensed general contractor, to take assignment of any subcontracts Huffman entered if Zimmer terminated the general contracts and notified the subcontractors of the assignment in writing. (*See id.*, p. 90).

The subcontracts recognized Huffman's general contracts with Zimmer and stated that AEC "agree[d] to perform, as an independent contractor, the portion of Huffman's work under the [general contracts] as set forth in [the subcontracts'] scope of work." (*See* docs. 84-3, p. 3; 88-9, p. 3). To that end, the subcontracts laid out AEC's scope of work as described above. (*See* docs. 84-3, pp. 35-38; 88-9, pp. 35-40). The subcontracts contained a contingent assignment clause that permitted Zimmer to fill Huffman's shoes as the general contractor if Zimmer terminated Huffman's general contracts. (*See* docs. 84-3, p. 25; 88-9, p. 24). The subcontracts also contemplated project scheduling. They required AEC to "prosecute" its subcontract work "in strict accordance with [the general contractor's] schedule and sequencing directives and to otherwise prosecute the work diligently and in cooperation with others contributing to the work … so as to not hinder in any way [the general contractor's] compliance with its project schedule, milestone dates, and completion

deadlines." (Docs. 84-3, p. 12; 88-9, p. 11). Art. 3.4 of the subcontracts required AEC to pay $1,000 in liquidated damages "per calendar day for each day [AEC] fails to meet the portion of the schedule[s] attributed to its work or for each calendar day beyond allotted contract time that [AEC] is not complete with its work." (Docs. 84-3, p. 12; 88-9, p. 12).

The subcontracts also imposed workmanship and warranty obligations on AEC. For example, the subcontracts required AEC to "promptly correct" nonconforming work and bear the costs of correction:

> If [the general contractor] rejects the Subcontract Work or the Subcontract Work is not in conformance with the Subcontract Documents, [AEC] shall promptly correct the Subcontract Work whether it has been fabricated, installed, or completed. [AEC] shall be responsible for the costs of correcting such Subcontract Work, any additional testing, inspections, and compensation for services and expenses of [the general contractor] made necessary by the defective work.

(Docs. 84-3, p. 9; 88-9, p. 9). Moreover, Exhibit A required AEC to bear all remedial and corrective costs for work not done in accordance with the subcontracts. (*See* docs. 84-3, p. 31, 88-9, p. 31). If AEC failed to comply with these requirements, then § 7.1.2 of the subcontracts provided a two-notice termination procedure, which permitted the general contractor to terminate AEC for cause after a second 48-hour cure period passed.

In the event of termination for cause, the subcontracts allowed the general contractor "to recover from [AEC] all associated costs, expenses, and other damages, including but not limited to associated legal fees and any amounts paid to correct and/or complete the Subcontract Work (plus 15%) that, together with all other funds paid to complete any portion of the Subcontract Work, exceed the Subcontract Amount established under [the subcontracts]." (Docs. 84-3, p. 23; 88-9, p. 23).

## C.    Construction Delays and Contract Terminations

By September 2022, both projects had problems. Construction of the Terraces' pads lagged months behind schedule. Progress on the Terraces' utilities and paving also stalled. Similar problems plagued the Boardwalk project. The pads for A1 and A2 at the Terraces site were delayed for a minimum of twelve weeks, and after rock was uncovered under pad A3, its construction was delayed too. Because the pads were foundational parts of the projects, vertical construction was hindered.

Unsurprisingly, Zimmer was displeased with the delays. So on September 16, 2022, Zimmer terminated Huffman from both the Terraces and Boardwalk projects "for convenience." (*See* docs. 87-13, p. 2; 87-14, p. 2). The termination letters noted that Zimmer would "review all subcontracts … that [were] in place for [the] project[s]," so it could "determine if any should be assigned to [Zimmer] or simply terminated." (*Id.*). According to Zimmer's corporate representative, Charles Tucker, Zimmer terminated Huffman because of its poor management and because it partly caused the delays. A month later, Zimmer took assignment of AEC's subcontracts and effectively filled Huffman's shoes as the general contractor. Zimmer notified AEC of the assignment on October 12, 2022.

Firing Huffman apparently didn't improve things because Zimmer contends that, by January 2023, AEC had fallen nearly five months behind schedule on several items at the Terraces, including pad A1, the clubhouse pad, the pool pad, the sanitary sewer, and water lines. Similar delays stalled the Boardwalk project. Zimmer also identified foundational issues at the Terraces site, "including over-excavation, unsuitable/reworked fill, and a large deleterious soil/rock stockpile requiring export." (Doc. 90, p. 15). Testing showed that the clubhouse pad at the Terraces "required reworking due to moisture and improper compaction." (*Id.*). And the discovered rock under pad A3 continued to impede construction.

8

By April 2023, Zimmer had enough of the delays. So as the assignee of the subcontracts, Zimmer issued a detailed written notice to AEC for both projects under § 7.1.2 of the subcontracts. The notices identified performance, testing, and schedule deficiencies and demanded cure. They also provided AEC with a new schedule "to keep the project moving." (*See* doc. 89-19, p. 5). After two days passed, Zimmer issued AEC a follow-up notice reiterating the demand to cure and providing notice of an intention to terminate the subcontracts. And four days after that, Zimmer sent AEC a second formal notice of intent to terminate for cause due to AEC's default and apparent abandonment of the projects. AEC never cured the defaults identified in Zimmer's notices, so on May 3, 2023, Zimmer terminated AEC for cause on both projects. By the termination date, AEC had received approximately $4.5 million in payments. Of that total, Zimmer had paid AEC roughly $3.2 million after it took the assignment of the subcontracts.

The same day Zimmer terminated AEC, it hired Buffalo Builders, LLC to step in as the general contractor for the Terraces and Boardwalk. The projects were eventually corrected and completed.

## D. Zimmer's Alleged Damages

During discovery, Zimmer estimated damages across both projects to be $69,589,985.41. Here's how Zimmer calculates damages for Terraces:

**HUNTSVILLE: HIGH MOUNTAIN - DAMAGES**

| SUMMARY | TOTAL | |
| --- | --- | --- |
| Interest Expense | $ | 840,512.51 |
| Loss of Rents | $ | 5,396,437.14 |
| Opportunity Cost | $ | 20,474,072.22 |
| Construction Replacement Cost | $ | 5,384,900.50 |
| Construction Corrective Work | $ | 334,994.64 |
| Insurance Expense | $ | 291,827.00 |
| ZDC Mgmt | $ | 175,000.00 |
| Travel Expense | $ | 13,606.08 |
| Legal Expense | $ | 549,030.40 |
| Outside Consultants | $ | 178,362.52 |
| TOTAL LOSS: | $ | 33,638,743.01 |

(Doc. 98-1, p. 6). And here's how Zimmer calculates damages for the Boardwalk:

**HUNTSVILLE: RESEARCH - DAMAGES**

| SUMMARY | | |
|---|---|---:|
| Interest Expense | $ | 833,117.79 |
| Loss of Rents | $ | 4,117,127.85 |
| Opportunity Cost | $ | 28,393,672.22 |
| Construction Replacement Cost | $ | 1,411,766.66 |
| Construction Corrective Work | $ | 141,887.16 |
| Insurance Expense | $ | 83,407.40 |
| ZDC Mgmt | $ | 175,000.00 |
| Travel Expense | $ | 13,606.07 |
| Legal Expense | $ | 549,056.92 |
| Outside Consultants | $ | 232,600.33 |
| **TOTAL LOSS :** | **$** | **35,951,242.40** |

(Doc. 98-1, p. 25).

Some of these figures are straightforward and don't require much explanation. Others are more complex. Using the Terraces as an example, Zimmer's interest expense category consists of a "preferred" interest return to an investor and LLC member, CK Management. (*See* doc. 86-3, pp. 36-37). Zimmer calculated the "loss of rents" category by assuming an apartment occupancy rate at 95%, calculating a net operating income based on projected rents, dividing it by twelve to get a monthly figure, and then multiplying the remaining value by eighteen (*i.e.*, the number of months Zimmer claims AEC delayed completion). (*See id.*, pp. 39-40). And Zimmer calculated its largest category of damages, "opportunity cost," by generating a net value for the properties had they been completed on time with a 4.5% capitalization rate and subtracting the actual net value for the properties when they were completed with a 6% capitalization rate. (*See id.*, pp. 41-42; *see also* doc. 98-1, p. 23). According to AEC's corporative representative, the applicable market capitalization rate increased from 4.5% to 6% during the 18-month construction delay, and that rate increase reduced the value Zimmer could have received by selling the properties on the open market.[3]

---

[3] Tucker said during his deposition that Zimmer had received "emails from brokers" inquiring about the properties. (*See* doc. 86-3, p. 42). But at the time of Tucker's deposition, Zimmer was not actively attempting to sell either the Boardwalk or the Terraces. (*See id.*).

10

### E.    Claims and Pending Motions

Zimmer sued AEC on September 5, 2023. AEC answered and counterclaimed. (*See* doc. 17). In December 2023, Zimmer filed third-party claims against Huffman and Travelers Casualty and Surety Company of America. (*See* doc. 24). The parties settled those third-party claims, (*see* docs. 67, 68), leaving only Zimmer and AEC suing each other.

This order deals with Zimmer's four claims; two brought by ZP 360 related to the Terraces and two by ZP 361 related to the Boardwalk:

- **Count 1: Breach of Contract**. As assignee of the Terraces subcontract, ZP 360 contends that AEC breached its obligations under the subcontract by performing defective work, failing to complete its scope of work, overbilling for work not performed, causing damage to the Terraces site and adjacent properties, failing to perform timely work, and removing materials from the Terraces site without permission. (*See* doc. 6, pp. 8-9).
- **Count 2: Negligence**. As owner of the Terraces, ZP 360 claims that AEC owed it a duty to perform work "in a reasonable and prudent manner and in accordance with the applicable standard of care exercise[d] by general contractors on the same or similar projects, and in accordance with applicable Legal Requirements." (*Id.*, pp. 9-10). ZP 360 says that AEC breached that duty and caused it to suffer damages. ZP 360 also contends that AEC's failure to comply with applicable Legal Requirements "constitutes negligence per se under Alabama law." (*Id.*).
- **Count 3: Breach of Contract**. As assignee of the Boardwalk subcontract, ZP 361 claims that AEC breached its contractual obligations in the same manner described in Count 1. (*See id.*, pp. 10-11).
- **Count 4: Negligence**. As owner of the Boardwalk, ZP 361 contends that AEC breached its duty of care in the same manner described in Count 2. (*See id.*, pp. 11-12).

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record showing the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323. The burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Id.* at 325. When the moving party has carried its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323.

The standard of review on cross-motions for summary judgment is no different from the standard applied when only one party files a motion. *Torres v. Rock & River Food Inc.*, 244 F. Supp. 3d 1320, 1327 (S.D. Fla. 2016) (citing *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005)). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal quotation marks and citation omitted). Thus, "a court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Torres*, 244 F. Supp. 3d at 1327-28 (citing *Am. Bankers Ins. Grp.*, 408 F.3d at 1331).

## DISCUSSION

Both parties move, at least partially, for summary judgment on Zimmer's four claims. Zimmer also moves to strike AEC's amended answer and affirmative defenses. The court starts by analyzing AEC's motions and then moves to Zimmer's motions.

## I.      AEC's Motion for Summary Judgment on Zimmer's Claims

AEC moves for summary judgment on ZP 360 and ZP 361's claims on the same grounds. Those grounds are: (1) Zimmer cannot meet the elements of negligence per se or negligence and (2) Zimmer's breach of contract claims fail under Alabama law.

### A.      Zimmer's Negligence Claims: Counts 2 and 4

To begin, AEC contends that Zimmer cannot sustain claims for negligence per se. While Zimmer does allege in Counts 2 and 4 that AEC's deficient work "constitutes negligence per se under Alabama law," Zimmer clarified in its response briefs that it only brings claims for common law negligence. (*See* doc. 6, pp. 10, 12; *see also* doc. 101, p. 34). Because Zimmer has abandoned any claims for negligence per se, the court will **grant** AEC's motion for summary judgment on Counts 2 and 4 as much as they raise claims for negligence per se. With that said, Zimmer adequately pleads common law negligence. So the court will examine those claims.

To establish negligence under Alabama law, Zimmer must provide evidence to support the standard elements: (1) duty, (2) breach, (3) causation, and (4) damages. *See Albert v. Hsu*, 602 So. 2d 895, 897 (Ala. 1997). In the operative complaint, Zimmer pleads that (1) AEC owed a duty "to perform its work in a reasonable and prudent manner in accordance with the applicable standard of care exercise[d] by general contractors on the same or similar projects"; (2) AEC "breached its duty of care … by performing defective work, causing damage to the [projects] and adjacent properties, … and performing its work on the [projects] in violation of applicable Legal Requirements"; and (3) as a "direct and

proximate result of [AEC's] negligence, [Zimmer incurred] substantial additional construction and repair costs, property damage, and delay damages[.]" (Doc. 6, pp. 9-10, 12-13).

AEC contests the breach, causation, and damages elements. Specifically, AEC argues that Zimmer's negligence claims fail because (a) AEC cannot be held to Zimmer's pleaded standard of care (*i.e.*, that of "general contractors on the same or similar projects"), (b) Zimmer failed to produce evidence from a licensed subcontractor in AEC's line of work that AEC breached the standard of care, (c) Zimmer failed to produce evidence of defective work, and (d) Zimmer failed to produce evidence reflecting costs that it incurred from the alleged project damage or completion costs. (*See* docs. 91, pp. 18-21; 93, pp. 17-20). AEC also contends in its reply brief that Zimmer's negligence claims fail because they are incompatible with Zimmer's breach of contract claims. (*See* doc. 106, p. 14).

1.      <u>Standard of Care Argument</u>. Zimmer pleads that AEC owed a duty "to perform its work in a reasonable and prudent manner and in accordance with the applicable standard of care exercise[d] by ***general contractors*** on the same or similar projects[.]" (*See* doc. 6, pp. 9, 12) (emphasis added). AEC contends this assertion is "problematic" because "AEC was not the general contractor on the project, rather it was a subcontractor[.]" (Docs. 91, p. 18; 93, p. 17). AEC is correct that the applicable standard of care for its conduct is that of a subcontractor—not a general contractor. But whatever difference that label yields is inconsequential for purposes of summary judgment. Zimmer's complaint makes clear that AEC was a subcontractor and that Zimmer seeks to hold AEC liable for negligence as a subcontractor. So, looking at the complaint in its entirety, the court finds no reason to grant AEC summary judgment based on the technical language Zimmer used in Counts 2 and 4. *See Smith v. Commissioner, Ala. Dep't of Corr.*, 2021 WL 4916001, at \*2 (11th Cir. Oct. 21, 2021) (refusing to "prioritize the form of the pleadings over their substance"); *see also* Fed. R. Civ. P. 8(e) ("Pleadings must be construed as to do justice.").

2.    Expert Qualifications Argument. Next, AEC argues that Zimmer has "failed to meet its burden to maintain its negligence claims" because it didn't "produce[] evidence from a licensed subcontractor, who works in the same line of work of AEC, that AEC breached any standard of care" on the projects. (*See* docs. 91, pp. 18-19; 93, pp. 17-18). This argument fails.

Zimmer's expert, David Marsh, opined that AEC provided defective work at both project sites. (*See* doc. 80-3, pp. 9-14). And while Marsh is not a "licensed subcontractor," that gap in his qualifications isn't disqualifying. Indeed, courts determine an expert's qualifications by assessing his knowledge, skill, education, training, and experience—not solely his professional licensure. *See United States v. Frazier*, 387 F.3d 1244, 1260-61 (11th Cir. 2004) (en banc). Marsh is a licensed professional engineer in Alabama with over 19 years of experience in engineering and project management. (*See* doc. 83-1, pp. 4-5). He's familiar with relevant industry standards applicable to AEC's workmanship. And he works for Engineering Consulting Services, a construction firm in Huntsville that was involved with the Terraces and Boardwalk projects. So his overall qualifications render him fit to provide opinions in this case.

At bottom, "a witness is qualified as an expert if he is the type of person who should be testifying on the matter at hand." *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 852 (11th Cir. 2021). Because Marsh fits that bill, the court will deny AEC's motion for summary judgment based on Marsh's qualifications. AEC, of course, can argue any shortcomings it perceives in Marsh's qualifications to a jury.

3.    Defective Work Argument. AEC also contends that, even if Marsh is qualified to provide opinions on defective work, he did not sufficiently identify property damage caused by AEC at either the Terraces or Boardwalk sites.

AEC is wrong. According to Marsh's expert report, AEC inflicted physical damage to the Boardwalk site by "clearing beyond authorized construction limits." (*See* doc. 80-3, p. 12). More specifically, Marsh says

15

that AEC left a shear cut in the Boardwalk Phase 2 area and that this cut is "not stable long-term and should be anticipated to erode and slough." (*Id.*). While Marsh couldn't quantify how much Zimmer would be forced to spend to correct this defective work, he noted that it could impose a "very significant cost" to "restore the area to the pre-development condition." (*Id.*).

Marsh identified even more examples of AEC's defective work at the Terraces site. For example, Marsh says in his report that AEC removed "soil overburden that was suitable for reuse as fill" from the Terraces site. (*Id.*, p. 13). This was problematic, according to Marsh, because it led to "a significant deficit in soil material quantity as the final grading progressed." (*Id.*). Marsh also says that AEC damaged the Terraces site by, once again, "clearing beyond authorized construction limits." (*Id.*). According to Marsh, AEC "cleared and partially graded" a vegetative buffer at the eastern side of the Terraces site, which "create[d] more susceptibility of the site to erosive forces" and resulted in "run off faster than the Civil Engineer designed the site to handle." (*Id.*). Finally, Marsh notes in his report that AEC "overexcavat[ed]" rock beyond the basement walls for Buildings A1, A2, and A3. (*Id.*). Marsh says this defective work "required far greater volume of fill to backfill the [basement] walls and [caused] significant delay to replace the excessive excavation." (*Id.*).

As shown, Marsh identified specific examples of "defective work" by AEC that delayed the projects and caused Zimmer to bear remediation costs. So AEC is not entitled to summary judgment based on its argument that Marsh failed to identify property damaged caused by AEC.

4.    Damages Argument. AEC next contends that Zimmer "failed to provide any other form of credible evidence reflecting costs it incurred from the alleged site damage or completion costs." (Docs. 91, p. 20; 93, p. 19). AEC argues that Zimmer's claimed damages, reflected in a spreadsheet and informed by remediation costs submitted by Buffalo Builders, are speculative and do not specifically identify the costs Zimmer incurred to fix AEC's defective work.

AEC is correct that Zimmer's experts can't precisely determine the amount of damages Zimmer incurred because of AEC's allegedly defective work. Marsh, for example, attributes blame for the defective shear cut at the Boardwalk site to AEC but states that Huffman's "lack of oversight and control" also contributed to Zimmer's remediation costs. (*See* doc. 80-3, p. 12). But that's where Alabama rules on tort liability kick in. Under Alabama law governing joint and several liability, "[a] tort-feasor whose negligent act or acts proximately contribute in causing an injury may be held liable for the entire resulting loss." *Holcim (US), Inc. v. Ohio Cas. Ins. Co.*, 38 So. 3d 722, 729 (Ala. 2009) (quoting *Nelson Bros., Inc. v. Busby*, 513 So. 2d 1015, 1017 (Ala. 1987)). Because Zimmer has provided evidence that AEC engaged in defective work that proximately caused Zimmer to suffer remediation and delay costs, AEC can be held liable for the entire resulting loss. Thus, AEC is not entitled to summary judgment based on Zimmer's failure to pinpoint the damages AEC caused.

5.     <u>Reply Brief Argument</u>. Finally, AEC contends in its reply brief that Zimmer cannot sustain negligence claims because they arise from a "breach of promise within the [subcontracts]." (Doc. 106, p. 14). This argument fails for two reasons. First, AEC waived the argument by waiting to raise it until the reply brief. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."). Second, even if AEC hadn't waived the argument, it would still likely fail because Zimmer can pursue negligence claims based on AEC's negligent affirmative conduct in its performance of the subcontracts. *See Morgan v. S. Cent. Bell Tel. Co.*, 466 So. 2d 107, 114 (Ala. 1985) (stating that while there is "no tort liability for nonfeasance for failing to do what one has promised," there can be tort liability "for misfeasance, or negligent affirmative conduct in the performance of a promise"). Here, Zimmer claims that AEC engaged in misfeasance by damaging the project sites. Those claims sound in tort and are actionable under Alabama law.

―――

Case 5:23-cv-01178-CLM   Document 116   Filed 07/21/26   Page 18 of 31

In sum, the court will grant AEC's motions on Counts 2 and 4 as much as Zimmer raises claims for negligence per se. But the court will deny AEC's motions as applied to Zimmer's common law negligence claims.

### B.   Zimmer's Breach of Contract Claims: Counts 1 and 3

AEC next challenges Zimmer's breach of contract claims in Counts 1 and 3. To prove a breach of contract under Alabama law, Zimmer must establish (1) the existence of a valid contract binding the parties; (2) its own performance under the contract; (3) the defendant's nonperformance; and (4) damages. *S. Med. Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995).

Zimmer asserts its breach of contract claims as the assignee of the subcontracts between Huffman and AEC. *See Nissan Motor Acceptance Corp. v. Ross*, 703 So. 2d 324, 326 (Ala. 1997) ("A valid assignment gives the assignee the same rights, benefits, and remedies that the assignor possesses."). As assignee, Zimmer claims that AEC breached both subcontracts by: (a) performing defective work; (b) failing to complete its scope of work; (c) overbilling ZP for work that was not performed; (d) causing damage to the project sites and adjacent properties; (e) failing to timely perform its work; (f) removing materials from the site without approval; and (g) performing its work in violation of "Legal Requirements." (*See* doc. 6, pp. 8-12).

AEC challenges Zimmer's breach of contract claims on the following grounds: (1) Zimmer is prohibited under Alabama law from acting as its own general contractor; (2) Zimmer's "contract damages" are misplaced; (3) Zimmer cannot assert delay damages as assignees of the subcontracts; (4) AEC was not bound by a project schedule; (5) Zimmer is not entitled to attorneys' fees; and (6) Zimmer's delay damages are barred by accord, satisfaction, and release. (*See* docs. 91, p. 2; 93, p. 2). The court walks through each argument in turn.

18

1.    <u>Legal Prohibition Argument</u>. To start, AEC contends that Alabama Code § 34-8-1(a) prohibited Zimmer from taking assignment of the subcontracts because Zimmer lacks an appropriate license to engage "in the business of general contracting." (*See* docs. 91, p. 22; 93, p. 21). Because AEC's argument rests on the interpretation of an Alabama statute, the court starts with its text. When the parties signed the subcontracts, the Alabama Code defined a "general contractor" as follows:

> (a) For the purpose of this chapter, a 'general contractor' is defined to be one who, for a fixed price, commission, fee, or wage undertakes to construct or superintend or engage in the construction, alteration, maintenance, repair, rehabilitation, remediation, reclamation, or demolition of any building, highway, sewer, structure, site work, grading, paving or project or any improvement in the State of Alabama where the cost of the undertaking is fifty thousand dollars or more, shall be deemed and held to have engaged in the business of general contracting in the State of Alabama.

Ala. Code § 34-8-1(a).[4] Building on this definition, Ala. Code § 34-8-6(a) makes it a crime for any person or entity without a valid general contracting license to engage in the business of general contracting:

> (a) Any person, firm, or corporation not being duly authorized who shall engage in the business of general contracting in this state, except as provided for in this chapter, and any person, firm, or corporation presenting or attempting to file as its own the license certificate of another, or who shall give false or forged evidence of any kind to the board, or to any member thereof, in obtaining a certificate of license, or who falsely shall impersonate

---

[4] The Alabama Legislature amended this provision in 2024 and raised the statutory threshold from $50,000 to $100,000.

> another, or who shall use an expired or revoked certificate of license shall be deemed guilty of a Class A misdemeanor and for each offense for which he or she is convicted shall be punished as provided by law[.]

Alabama courts have applied versions of the above provisions in cases where an unlicensed contractor seeks to recover against an owner in contract. *See, e.g.*, *Architectural Graphics and Const. Servs., Inc. v. Pitman*, 417 So. 2d 574, 576-77 (Ala. 1982). In those cases, courts have consistently refused to enforce commercial contracts that exceed the statutory threshold because, according to the courts, the parties entered into the contracts illegally. *See id.*; *see also Hawkins v. League*, 398 So. 2d 232, 237 (Ala. 1981) (reversing a judgment for an unlicensed general contractor because it did not have a valid general contractor's license).

With that background law in mind, AEC contends that Zimmer's claims for breach of the subcontracts must fail because, when Zimmer took assignment of the subcontracts from Huffman, it did not hold a valid general contractor's license. Put differently, AEC asks the court to find the assignments (and by extension, the subcontracts) void because enforcing them would be to enforce illegal contracts.

AEC is right that Zimmer didn't hold a general contractor's license when it took assignment of the contracts. But that doesn't matter. Remember, Ala. Code § 34-8-1(a) defines a "general contractor" as one who "for a fixed price, commission, fee, or wage" undertakes construction projects in Alabama above the statutory threshold cost. Zimmer didn't take assignment of the subcontracts and then charge itself a "fixed price, commission, fee or wage[.]" So it doesn't meet the statute's definition of a "general contractor" "engaged in the business of general contracting." And since it doesn't meet that definition, the illegality provisions found in § 34-8-6(a) don't apply to the assignments.

This interpretation is strengthened by a neighboring "owner's exemption" provision found in Ala. Code § 34-8-7(a)(3). That provision

exempts "a person, firm, or corporation constructing a building or other improvement on his, her or its own property" from licensing requirements "provided that any of the work contracted out complies with the definition in this chapter for general contractor." Zimmer, while assignee of the subcontracts, still maintained its status as an entity "constructing a building or other improvements" on its own property. Coupled with the plain reading of § 34-8-1(a)'s definition of a general contractor, this provision shows that Alabama's statutory scheme doesn't invalidate the subcontract assignments.

Likely sensing that the statute's language cuts against its position, AEC latches on to Ala. Admin. Code r. 230-X-1-.07, which provides:

> A person, firm, or corporation which undertakes to construct a building or other improvements on his/her own real property (Exception--is long term lease with option to extend/or purchase as in an Industrial Development Board situation) is not required to be licensed as a general contractor if the person, firm or corporation's own forces (non-contractual) are used. An owner/builder may only let and/or award contracts for work in the amount of $50,000 ($5,000 for swimming pools) or greater to a properly licensed prime contractor.

According to AEC, this administrative code provision makes Zimmer an unlicensed general contractor because, at the time it took assignment of the subcontracts, the project work was being performed by subcontractors rather than Zimmer's employees.

The court rejects this argument for a few reasons. First, the Alabama Supreme Court has cautioned courts from reading administrative codes in a way that narrows or alters statutes, and adopting AEC's reading of the administrative code would do exactly that here. *See Ex Parte Jones Mfg. Co.*, 589 So. 2d 208, 210-11 (Ala. 1991) ("[A] regulation cannot subvert or enlarge [a] statutory policy" and a general grant of regulatory authority "cannot override the specific provision" of a

statute). Second, AEC cannot point to any binding Alabama case law that adopted and applied AEC's view of the administrative code on a similar set of facts. And third, Alabama case law suggests that courts shouldn't enforce the licensing statutes to void contracts unless it's shown that an unlicensed general contractor intended to circumvent licensing requirements. *See Med Plus Props. v. Colock Const. Grp., Inc.*, 628 So. 2d 370, 375 (Ala. 1993). AEC hasn't made that showing here.

To sum up, the court finds that Zimmer's assignment of the subcontracts is not voided by Alabama's general contractor licensing requirements. So the court will deny AEC's motion for summary judgment on that ground.

2.    Misplaced Damages Argument. AEC next contends that Zimmer cannot recover certain categories of damages it claims because the damages "do not flow from its capacity as assignee to the [subcontracts]" but instead "reflect financial losses which are uniquely limited to [Zimmer's] capacity as the project owner." (*See* docs. 91, p. 25; 93, p. 24). These challenged damages categories include: (1) interest expense for an investor in Zimmer; (2) loss of rents that may have been earned had the projects been completed on time; (3) opportunity costs Zimmer incurred because of market condition changes that occurred between the projected date of completion and the actual date of completion; and (4) increased management costs incurred by Zimmer between the projected date of completion and the actual date of completion.

AEC is right that Zimmer can't recover these damages. Under Alabama law, "a valid assignment gives the assignee the same rights, benefits, and remedies that the assignor possesses." *Nissan Motor Corp.*, 703 So. 2d at 326. So Zimmer, as assignee, gets the "same rights, benefits, and remedies" that ***Huffman*** would have possessed if Huffman had remained the general contractor. *See id.* Section 7.1.2 to the subcontracts expressly permits the general contractor to recover from AEC "all associated costs, expenses, and other damages, including but not limited

to associated legal fees and any amounts paid to correct and/or complete the Subcontract Work (plus 15%) that, together with all other funds paid to complete any portion of the Subcontract Work, exceed the Subcontract Amount established under [these] agreement[s]." (*See* docs. 84-2, p. 144; 88-9, p. 23). Exhibit A to the subcontracts also states that AEC is "responsible [for] all remedial/corrective costs" if its work fails to comply with the subcontracts. (*See* docs. 84-2, p. 152; 88-9, p. 31). But nothing in the subcontracts permits Zimmer—standing in Huffman's shoes as the subcontractor assignee—to recover damages only relevant to Zimmer's role as the owner of the Terraces and Boardwalk.

Zimmer admits that completion and correction costs "are the strongest category of damages because they are explicitly contemplated by the [subcontracts] that AEC assigned." (*See* doc. 102, p. 33). Yet Zimmer still contends that "AEC's challenges to [Zimmer's] recovery of consequential damages such as lost rents, interest expenses, or opportunity costs go the measure of damages at trial—not to whether [Zimmer] is entitled to any recovery." (*Id.*). That's not entirely correct. While it's true that certain categories of damages being unavailable doesn't doom Zimmer's breach of contract claims, it's not true that all "consequential damages … go to the measure of damages at trial." (*See id.*). Zimmer filled Huffman's shoes under the subcontracts, so Zimmer can only recover what Huffman could've recovered had the subcontracts not been assigned and Huffman sued AEC. *See Nissan Motor Corp.*, 703 So. 2d at 326 ("A valid assignment gives the assignee ***the same rights, benefits, and remedies*** that the assignor possesses.") (emphasis added). Because Huffman couldn't have recovered opportunity costs or any other damages unique to Zimmer as the owner of Terraces and Boardwalk, Zimmer can't either. The court will therefore grant in part AEC's motion for summary judgment on Counts 1 and 3. Zimmer may not seek to recover breach of contract damages at trial except those that are specifically available to it as assignee of the subcontracts.

3.    Delay Damages Argument. AEC also attacks Zimmer's claim for "delay damages" on the grounds that it's disallowed by Art. 3.4 of the

23

subcontracts. Art. 3.4 provides:

> **Delays Caused by Subcontractor**. In the event liquidated damages are provided for and assessed by Owner against Huffman under the Prime Contract, Huffman may, in addition to any other available remedies or damages, assess against or otherwise recover from Subcontractor a share of the damages in proportion to the Subcontractor's share of the responsibility for the damages. Subcontractor may be assessed a minimum of $1,000 per calendar day for each day the Subcontractor fails to meet the portion of the schedule attributed to its work or for each calendar day beyond allotted contract time that Subcontractor is not complete with its work.

(Docs. 84-3, p. 12; 88-9, p. 12). AEC interprets this provision to limit Zimmer's right "to assert delay damages against AEC only to the extent it asserted liquidated damages against Huffman." (Docs. 91, p. 28; 93, p. 27). And because Zimmer didn't assert liquidated damages against Huffman before settling its claims with Huffman, AEC says that Zimmer cannot seek delay damages now as assignee of the subcontracts.

Zimmer argues in response that its delay damages stem from § 7.1.2's broad damages provision—not Art. 3.4's narrow one. According to Zimmer, § 7.1.2 applies in instances where the general contractor terminates the subcontracts "for cause," which is what happened here. So, Zimmer says, AEC's reading of Art. 3.4 "would render the termination-for-cause remedies meaningless by eliminating delay damages in every case where the owner settled with the general contractor without seeking liquidated damages." (*See* docs. 101, pp. 30-31; 102, p. 31).

Zimmer has the better argument. Art. 3.4, by its plain language, only applies "***in the event*** liquidated damages are provided for and assessed by [Zimmer] against Huffman under the Prime Contract." (Docs. 88-5, p. 3; 88-9, p. 12) (emphasis added). Further, Art. 3.4 specifically notes that Zimmer (as assignee) may possess "any other available

remedies or damages." (*Id.*). So Zimmer's claim for delay damages isn't cabined by Art. 3.4.

AEC argues in the alternative that, even if "delay damages were recoverable, … AEC is only responsible for its share of responsibility for the same." (Docs. 91, p. 28; 93, p. 27). According to AEC, Zimmer's delay expert John Dillon "could not allocate responsibility for delays at [the projects]," so Zimmer can't maintain claims for delay damages under the subcontracts. Perhaps, but the court finds this issue is better suited for resolution at trial because Dillon could identify certain delays caused solely by AEC. (*See* doc. 85-2, p. 10). It may turn out that Zimmer can't attribute all (or even most) delays to AEC, but that doesn't bar the delay damages at the Rule 56 stage because Zimmer provides enough evidence to allow a reasonable juror to assess some delay damages. So the court will deny AEC's motion for summary judgment on Counts 1 and 3 based on its delay damages argument.

4.    Project Schedule Argument. AEC separately argues that, even if Zimmer can recover delay damages under the subcontracts, "AEC was not bound by a schedule for the [projects]," so there is no basis to find that a delay occurred. (*See* docs. 91, p. 29; 93, p. 28). This argument is also best reserved for trial. The subcontracts contemplated that AEC would "prosecute" its work "in strict accordance with [the general contractor's] schedule and sequencing directives and to otherwise prosecute the work diligently and in cooperation with others contributing to the work … so as to not hinder in any way [the general contractor's] compliance with its project schedule, milestone dates, and completion deadlines." (*See* doc. 84-2, p. 133). But there is conflicting evidence on whether the parties adopted a binding schedule.

On one hand, Zimmer contends that Huffman provided AEC with schedules for the Terraces and Boardwalk projects, and there are email communications between Huffman and AEC personnel that show, at the very least, Huffman and AEC exchanged "forecast" schedules. (*See* docs. 88-3, p. 2; 88-10, p. 3). On the other hand, AEC's corporate representative,

Bennett Steele, states in his affidavit that "AEC never agreed to a schedule and no schedule was ever made part of the [subcontracts]." (Docs. 86-1, p. 2; 86-2, p. 2). And when Zimmer's corporate representative was asked during his deposition whether he had seen any email communications "where AEC agreed to be bound by any schedule(s) for the time frame [Huffman] was on the job," he said he had not. (*See* doc. 87-4, p. 18; *see also* doc. 86-3, p. 13). It could be the case that Huffman should have provided AEC a definitive schedule for the projects and neglected to do so. It could also be the case that Huffman treated the circulated schedules as binding under the subcontracts. But that's a genuine fact question this court can't answer. Instead, the court must assume at the Rule 56 stage that the jury would side with Zimmer (the nonmoving party). As a result, the court will deny AEC's motion for summary judgment on Counts 1 and 3 based on the argument that AEC never agreed to project schedules.

5.    Attorneys' Fees Argument. AEC also argues that Zimmer cannot recover attorneys' fees for its breach of contract claims. A few different provisions in the subcontracts discuss attorneys' fees, so the court outlines them below.

Art. 6.1 of the subcontracts acts as an indemnitee provision and states, in relevant part:

> Subcontractor agrees to defend, indemnify, and hold harmless Huffman, Owner, General Contractor, [collectively, "Indemnitees"]… from and against any and all claims, actions, suits, causes of action, losses, damages, fines, judgments (including amounts paid in settlement), and all other costs, expenses, and charges of every kind and nature whatsoever (including reasonable attorneys' fees), incurred by or asserted against any of the Indemnitees, which arise out of or relate to the performance or nonperformance of the Subcontract Work or any breach of this Agreement by Subcontractor, or any

> other act, omission, or neglect by Subcontractor or any of Subcontractor's subcontractors, subsidiaries, or affiliates, … in connection with or otherwise relating to the Project[s], without regard to the cause or causes thereof[.]

(Docs. 84-3, p. 18; 88-9, p. 18). Section 7.1.2 also discusses attorneys' fees but in the termination for cause context:

> [I]f Subcontractor fails to commence and diligently continue correction to the satisfaction of [general contractor] within 48 hours of [the second notice of breach] [general contractor] may issue a notice terminating this Agreement for cause and shall be entitled to recover from Subcontractor all associated costs, expenses, and other damages, including, but not limited to, associated legal fees and any amounts paid to correct and/or complete the Subcontract Work (plus 15%) that, together with all other funds paid to complete any portion of the Subcontract Work, exceed the Subcontract Amount established under this Agreement.

(Docs. 84-3, p. 23; 88-9, p. 23). Finally, § 7.4.2 discusses attorneys' fees in the bankruptcy context:

> If Subcontractor is not performing in accordance with the Progress Schedule at the time a petition in bankruptcy is filed, or at any subsequent time, [general contractor], while awaiting the decision of the Subcontractor or its trustee to reject or to assume this Agreement and provide adequate assurance of its ability to perform, may avail itself of such remedies under this Article as are reasonably necessary to maintain the Progress Schedule. [General contractor] may offset against any sums due to or become due to Subcontractor all costs incurred in pursuing any of the remedies provided including … attorneys' fees.

27

(Docs. 84-3, p. 24; 88-9, p. 24).

Neither Art. 6.1 nor § 7.4.2 offer Zimmer the option to recover attorneys' fees in this case. Art. 6.1 doesn't apply because it is an indemnitee provision that requires AEC to "defend, indemnify, and hold harmless" the general contractor and Zimmer when they are sued for damages caused by AEC's performance under the subcontracts. And § 7.4.2 doesn't apply because its sole application arises in the bankruptcy context.

Section 7.1.2 is different. It broadly permits the general contractor (here, Zimmer as the assignee) "to recover from [AEC] **all** associated costs, expenses, and other damages, including but not limited to, associated legal fees and any amounts paid to correct and/or complete the Subcontract Work (plus 15%)" that relate to AEC's termination and defective work. (Docs. 84-3, p. 23; 88-9, p. 23) (emphasis added). For relevant purposes, Zimmer sued AEC to recover costs it expended by terminating AEC and hiring other contractors to repair and finish AEC's work. So Zimmer's attorneys' fees can fit within § 7.1.2's gamut.[5]

To be sure, Zimmer's corporate representative struggled to identify how all of Zimmer's claimed attorneys' fees and legal expenses related to AEC's breach and termination. (*See* doc. 86-3, pp. 60-62). But that is not a reason to grant summary judgment because the court finds that at least some of Zimmer's claimed attorneys' fees may be recoverable. At trial, Zimmer must be able to show how its claimed attorneys' fees fit within § 7.1.2.

6.    <u>Accord, Satisfaction, and Release Argument</u>. Finally, AEC contends that Zimmer's claims for delay damages are barred by accord,

---

[5] ZP 361 did not respond to AEC's attorneys' fees argument. Even so, the court must examine the evidentiary record—including the subcontracts—to determine whether AEC is entitled to summary judgment. *See Ogwo v. Miami Dade Cnty. Sch. Bd.*, 702 Fed. App'x 809, 810 (11th Cir. 2017) ("The non-movant's failure to respond to a defendant's motion for summary judgment is not fatal; rather, the court must determine if the facts in the record illustrate that the movant is entitled to summary judgment."). Because the court finds that the record undercuts AEC's argument on attorneys' fees, ZP 361's failure to respond does not warrant summary judgment.

satisfaction, and release because Zimmer settled with Huffman rather than asserting delay damages against Huffman.[6] The court presumes that AEC is relying on Art. 3.4 of the subcontracts, which provides a mechanism for recovering liquidated damages if AEC caused delays. (*See* supra part I.B.3). There are a few problems with this argument. For one, the court has already determined that AEC can seek delay damages under § 7.1.2 of the subcontracts. For another, the settlement agreement released Huffman—not AEC. AEC can be held independently liable for its alleged breaches of the subcontracts.

——

In sum, the court will grant in part and deny in part AEC's motion for summary judgment on Counts 1 and 3. Counts 1 and 3 will proceed to trial, but Zimmer may only seek to recover damages as permitted by the subcontracts. The parties (and the court, if necessary) will work to define the available damage categories in the pretrial order.

## II.    Zimmer's Partial Motion for Summary Judgment on its Claims

Zimmer moves for partial summary judgment on its breach of contract claims in Counts 1 and 3. As a refresher, Zimmer must prove the following breach of contract elements: (1) the existence of a valid contract binding the parties; (2) Zimmer's own performance under the contract; (3) AEC's nonperformance; and (4) damages. *Vaughn*, 669 So. 2d at 99.

As the court has found, genuine disputes of material fact preclude summary judgment for AEC on Counts 1 and 3 (*see* supra part I.B). Those genuine disputes of material fact likewise preclude summary judgment in Zimmer's favor. The court provides some examples below.

1.    <u>Fact Dispute: Binding Schedules</u>. To start, there is a genuine dispute whether binding schedules governed AEC's subcontract work. As discussed, Zimmer has provided emails showing that, at the very least,

---

[6] AEC says that Zimmer's "***claims*** are barred by accord and satisfaction and release," (docs. 91, p. 32; 93, p. 31) (emphasis added), but its argument focuses on Zimmer's claimed delay damages.

Huffman and AEC exchanged "forecast" schedules. But Zimmer's corporate representative admitted during his deposition that he had not seen any proof that AEC agreed to a final schedule for its work. And AEC's corporate representative maintains that "AEC never agreed to a schedule and no schedule was ever made part of the [subcontracts]." (Docs. 86-1, p. 2; 86-2, p. 2). So the court cannot say based on the current record whether a definitive schedule governed the subcontracts. And because a reasonable juror could go either way, the court must allow the delay issue to be tried.

2.     Fact Dispute: Zimmer's Damages. The parties also dispute the availability and scope of Zimmer's damages. Zimmer's experts can't rule out whether Huffman or others contributed to or outright caused certain delays. For example, the parties dispute when the necessary "forms" to complete the Terraces' retaining walls arrived. (*Compare* doc. 82-2, p. 40 *with* doc. 81-1, p. 49). This matters because Huffman was supposed to build the retaining walls, and AEC could not complete the upper-level pads without them. Under AEC's version of events, the forms didn't arrive until April 2023—months after Zimmer claims that AEC should have finished the upper-level pads. The parties' expert reports further lay bare disputes about whether AEC caused certain delays Zimmer claims damages for.

3.     Fact Dispute: AEC's Defective Work. The parties also dispute whether AEC engaged in defective work. For example, Zimmer's damages expert says in his report that AEC "overexcavat[ed]" rock beyond the basement walls for Buildings A1, A2, and A3 at the Terraces, which "required far greater volume of fill to backfill the [basement] walls and [caused] significant delay to replace the excessive excavation." (*See* doc. 80-3, p. 12). But AEC's expert counters that AEC's actions were justified and necessary. (*See* doc. 82-2, p. 35).

———

The court could go on, but the point is made. Genuine disputes of material fact prevent the court from deciding whether and to what extent AEC breached the subcontracts and what damages Zimmer may recover.

Thus, the court will deny Zimmer's partial motion for summary judgment on Counts 1 and 3.

### III.   Zimmer's Motion to Strike

Zimmer moves to strike AEC's amended answer and affirmative defenses because AEC added the affirmative defense of accord, satisfaction, and release after its deadline to amend had passed. (*See* doc. 75). Because the court examined and rejected AEC's accord, satisfaction, and release argument, the court will deny Zimmer's motion to strike as moot.

### CONCLUSION

For these reasons, the court (1) **GRANTS IN PART** and **DENIES IN PART** AEC's motions for summary judgment (docs. 78, 79); (2) **DENIES** Zimmer's partial motion for summary judgment (doc. 88); and (3) **DENIES** Zimmer's motion to strike **AS MOOT** (doc. 75). The court will enter an accompanying order carrying out its ruling.

**DONE** and **ORDERED** on July 21, 2026.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE